**Eugene John MAUREY, Plaintiff,**

v.

**UNIVERSITY OF SOUTHERN CALI-
FORNIA and Edward J. Blakely,
and Does 1–50, Defendants.**

**No. CV98–2900 NM AIJX.**

United States District Court,
C.D. California.

July 2, 1999.

---

## ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

MANELLA, District Judge.

### I

### *INTRODUCTION*

On December 15, 1997, Eugene John Maurey filed this action against the University of Southern California ("USC"), Edward J. Blakely, and does 1 through 50 inclusive for: 1) discrimination and harassment under Title VII, 42 U.S.C. § 2000e; 2) discrimination and harassment under the Fair Employment and Housing Act (FEHA) Gov.Code, § 12940 *et seq.*; 3) retaliation under Title VII; 4) retaliation under FEHA; 5) violations of 42 U.S.C. § § 1981 and 2000d[1]; 6) breach of contract; 7) breach of covenant of good faith and fair dealing; 8) tortious interference with contract and prospective economic advantage by Blakely; and 9) tortious termination/refusal to hire in violation of public policy, FEHA Gov.Code, § 12940 *et seq.*

On November 20, 1998, defendants filed a Motion for Judgment on the Pleadings, which was heard by Judge Margaret M. Morrow January 4, 1999. Judge Morrow granted in part and denied in part defendants' motion. Following Judge Morrow's January 8, 1999 order, eight claims remain: 1) Discrimination and Harassment (Title VII); 2) Discrimination and Harassment (FEHA); 3) Retaliation (Title VII); 4) Retaliation (FEHA); 5) Discrimination (42 U.S.C. § § 1981 & 2000d); 6) Breach of Contract; (9) Tortious Termination/Refusal to Hire; and 10) Public Policy Violation (disability discrimination).[2] USC is a named defendant in all eight claims. Blakely is named in the second, fourth, fifth, ninth, and tenth claims. However, Judge Morrow ruled that Blakely cannot be held individually liable for discrimination, or any alleged improper termination or hiring, under any theory.

On March 26, 1999, defendants filed the instant Motion for Summary Judgment on all remaining claims. On March 30, 1999, plaintiff filed his Opposition, and defendants filed their Reply May 10, 1999. On April 4, 1999, plaintiff filed an ex parte application for leave to conduct additional discovery, which was denied by this court April 20, 1999. On April 30, 1999, this court issued an order advising plaintiff that he could not introduce new documents or statements to oppose defendants' motion for summary judgment.[3]

In their instant motion defendants contend: 1) plaintiff's reverse race discrimination claims fail because plaintiff has not established a prima facie case and cannot establish pretext[4]; 2) plaintiff's retalia-

---

**1.** 42 U.S.C. § 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Plaintiff concedes that he cannot maintain this claim. Pl. Opp. Mot., p. 15.

42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

**2.** On December 22, 1998, plaintiff filed a First Amended Complaint adding this tenth claim for disability discrimination.

**3.** On May 4, 1999, this court issued a minute order advising the parties that Judge Manella is a member of the Board of Councilors of the USC Law School and instructing the parties that any motion to recuse must be filed by May 7, 1999. On May 17, 1999, Judge King denied plaintiff's motion to recuse Judge Manella. On June 4, 1999, the Ninth Circuit denied plaintiff's application for writ of mandamus seeking review of Judge King's order.

**4.** Relevant to plaintiff's first claim for Title VII race discrimination; second claim for FEHA race discrimination; fifth claim for discrimination under 42 U.S.C. § § 1981 & 2000d; sixth claim for breach of contract; and ninth claim for tortious termination/refusal to hire.

tion claims fail for the same two reasons[5]; 3) plaintiff's race harassment claim fails because it is time-barred, and the purported conduct does not meet the threshold required to state a claim for race-based hostile-environment harassment;[6] 4) plaintiff's contract claim fails because the employment relationship was terminable at will;[7] and 5) plaintiff's disability claim is time-barred, and plaintiff fails to establish a prima facie case of discrimination.[8]

Upon full consideration of the moving, opposition, and reply papers, the parties' arguments and authorities, and the entire record herein, the court *grants* defendants' motion for summary judgment on the grounds that there are no triable issues of material fact as to any of plaintiff's claims. Defendants' are entitled to summary adjudication as a matter of law as to each of plaintiff's claims.

## II

### RELEVANT FACTUAL BACKGROUND

Eugene John Maurey, a Caucasian male, worked for USC from 1988 to 1997. Plaintiff's Opposition Motion ("Pl.Opp."), p. 1. Between 1988 and 1992, Maurey worked in the USC School of Engineering, administering a technology transfer and trade assistance program. *Id.* He has a B.S. in Engineering from the University of Illinois, an MBA from the University of Chicago in finance and marketing, and a certificate in management from the Professional Management Program of the University of Southern California. *Id.* Maurey has been a business owner and worked in industries ranging from small manufacturing concerns to aerospace companies. *Id.;* Defendants' Motion for Summary Judgment ("Def.Mot."), Declaration

of Kelley L. Sbarbaro ("Sbarbaro Dec."), Exh. 87, Maurey resume. In 1980, Maurey had surgery to remove a tumor. As a result of this surgery, he lost all hearing in one ear, and one side of his face was partially paralyzed. Def. Mot., Sbarbaro Dec., Exhibit Q, Declaration of John Maurey. In addition, Maurey has suffered nerve damage which sometimes causes his speech to slur and occasionally interferes with the balance center in his deaf ear, causing him to appear unsteady or drunk. Pl. Opp., p. 22. Plaintiff also has a diagnosed sleep disorder for which he receives treatment. *Id.*

On July 1, 1992, an agency of the United States Government, the Economic Development Agency ("EDA") provided funding to create a University Center for Economic Development at USC's School of Engineering. Def. Mot., p. 5. The Center was to be the first such center located at a private university. Pl. Opp., p. 5. The EDA approved Maurey as Director of this new Center, and he remained the director for four years until the Center closed in the summer of 1996. Def. Mot., p. 5. When Maurey accepted the directorship, he signed a USC application for employment identifying himself as the Program Director for the EDA-funded Center for Economic Development. Def. Mot., Sbarbaro Dec., Exh. 38. The application, signed and dated June 16, 1992 by Maurey, states in section 4: "In consideration of my employment, I ... agree that my employment and compensation can be terminated at-will, with or without cause, at any time, either at my option or at the option of USC." *Id.,* p. 3.

The Center was organized as a one-man program, and Maurey was the Center's

---

**5.** Relevant to plaintiff's third claim for Title VII retaliation; fourth claim for FEHA retaliation; sixth claim for breach of contract, ninth claim for tortious termination/refusal to hire; and tenth claim for Public Policy Violation (disability discrimination).

**6.** Relevant to plaintiff's first claim for Title VII harassment; second claim for FEHA

harassment; and ninth claim for tortious termination/refusal to hire.

**7.** Relevant to plaintiff's sixth claim for breach of contract.

**8.** Relevant to plaintiff's tenth claim for Public Policy Violation (disability discrimination).

only employee. Def. Mot., p. 5; Def. Mot., Sbarbaro Dec., Exh. 32, National Association of Management and Technical Assistance Centers Peer Review Report ("Peer Review"). On June 30, 1996, the EDA decided not to renew funding for the Center. Defendants' Separate Statement of Undisputed Facts ("UF"), ¶ A7. However, the EDA did decide to fund a new center for economic development in USC's School of Urban & Regional Planning under the leadership of Dean Edward J. Blakely. *Id.*, ¶ A8.

Early in 1996, the EDA selected Maurey's program to be evaluated by a three-member team of university center directors. Def. Mot., p. 6. Prior to the team's visit to USC, they contacted Betty Atkinson, Planning Chief of the Seattle Regional Office of the EDA. Def. Mot., Sbarbaro Dec., Exh. 32, Peer Review. The Seattle Office of the EDA had concerns about the overall performance of the USC Center. *Id.* The review team included EDA center directors from the University of Oklahoma, the University of Illinois, and Western Carolina University. Id. The team met with Maurey and George Evans, Executive Director of the Western Research Application Center (WESRAC).[9] In addition, the team met with two community development organizations served by the Center, the Associate Dean of USC's School of Engineering, and key Regional EDA personnel. *Id.*

The peer review was highly critical of the Center's performance. *Id.* The report lists the following weakness for the Center: 1) no strategic plan with relation to programs and funding, no long-term vision, no attainment of new goals/objectives/ work plans; 2) lack of capacity to provide meaningful technical assistance through the Center's resources; 3) no understanding of the purpose of the EDA University Center Program; 4) lack of focused, diversified advisory committee; 5) a fractious approach to community and economic development; 6) failure to articulate meaningful assistance to claimed clients; 7) Center serves the needs of USC rather than the community; and 8) the Center lacks technical assistance within WESRAC. *Id.* Although the team recognized that WESRAC was an outstanding organization, it found that EDA's University Center Program had "fallen short of EDA program requirements." *Id.* The team concluded that program achievements were less than would have been expected from the funds invested, the staffing available, and the length of time (four years) the Center had been operational. *Id.*

Although a draft of the peer review was faxed to Maurey April 10, 1996, and a formal response to the many criticisms requested by May 10, Maurey neither responded, nor remembers bringing the review to the attention of George Evans. Def. Mot., p. 7. Evans received the peer review in May. Thereafter, he and Maurey made a proposal to the EDA to keep the Center in the School of Engineering. *Id.* The EDA rejected this proposal and decided not to renew funding for the Center, which expired June 30, 1996. *Id.* However, the EDA provided USC with a new grant to create a center in the School of Urban & Regional Planning, under the leadership of its dean, Edward Blakely. *Id.*

A. Leonard Smith, the Regional Director for the EDA located in Seattle, Washington is responsible for overseeing

---

9. WESRAC is a department of USC's School of Engineering. Def. Mot., Sbarbaro Dec., Exh. 32, Peer Review. Evans acted as the principal investigator for the Center run by Maurey. He provided some guidance and USC administrative interface to the Center. Evans allocated 10% of his time to the Center at no charge to the EDA contract. *Id.*

The team was originally scheduled to meet with Maurey and Evans January 29–30. However, Maurey canceled the peer review on short notice, resulting in a reprimand from Evans. Def. Mot., Sbarbaro Dec., Exh. 33, Letter from Evans to Maurey. In his letter, Evans noted that Maurey had canceled the peer review, claiming he had to be out of town on urgent family business, but later admitted this was a fabrication. *Id.*

EDA-funded University Center Programs in the Western Region. Declaration of A. Leonard Smith ("Smith Dec."), ¶ 2. Smith invited Blakely to apply for a new grant from the EDA. *Id.*, ¶ 4. Smith also told Blakely to put together a fresh team, under Blakely's personal leadership, and to staff the new center at the School of Urban and Regional Planning. Smith explained that the program should serve highly distressed, economically disadvantaged communities. *Id.*, ¶ 5. Smith had final approval over University Center staff and would not have approved the reappointment of John Maurey as Director for the EDA-funded University Center, because of the poor performance of the program under his directorship. *Id.*, ¶ 6; Def. Mot., Sbarbaro Dec., Exh. 32, Peer Review.

Maurey requested that Blakely provide funding for him to continue working in a temporary position at the new center, which Blakely did. Def. Mot., p. 8. From June 30, 1996 to February 24, 1997, Maurey was employed in this temporary position. Def. Mot., Sbarbaro Dec., Exh. Q, Declaration of John Maurey dated October 30, 1998, ¶ 3. However, Maurey never asked Blakely to hire him as Director of the new center. Def. Mot., p. 7.

Before he was fired from the directorship in June 1996, Maurey began looking for other jobs at USC. Def. Mot., Sbarbaro Dec., Exhs. 38, 82, 87. On April 18, 1996, Maurey sent a letter and his resume to Blakely requesting help in finding another job. Def. Mot., Sbarbaro Dec., Exh. 87. Although Maurey applied for over 20 jobs at USC from June 16 to August 20, 1996, he was not hired for any of them. Def. Mot., Sbarbaro Dec., Exh. 62.

Five months after being notified of his layoff from the School of Engineering, Maurey verbally complained to USC's Affirmative Action Office, and then filed a

written complaint with the office. *Id.* The written internal complaint, dated November 14, 1996, alleges that Maurey was discriminated against based on his age (then 44), disability (impaired hearing), and race (white). Def. Mot., p. 8; Sbarbaro Dec., Exh. 12. The basis for the complaint was a comment allegedly made by Blakely to David Shawaker, Senior Executive Director of Administrative Services for the Information Services Division, and then relayed by Shawaker to Evans, and thereafter to Maurey. *Id.;* Shawaker Deposition, p. 4. The alleged comment was: "John Maurey has two strikes against him in economic development. First, he has no educational credentials, second he's not black or Hispanic." Def. Mot., Sbarbaro Dec., Exh. 12. The meeting between Shawaker and Blakely took place July 9, 1996. Def. Reply, p. 5.

In a letter dated March 25, 1997, responding to Maurey's internal USC complaint, Blakely noted that the purpose of his meeting with Shawaker had been to discuss the pending transfer of the EDA-funded center from the School of Engineering to the School of Urban Planning and Development. Pl. Opp., Bellows Dec., Exh. 19. During the course of the meeting, Blakely and Shawaker discussed Maurey. *Id.* Blakely told Shawaker that he had received one formal and several informal complaints regarding Maurey's performance as director. *Id.* These complaints included: 1) that Maurey knew little or nothing about economic development; 2) that Maurey was unable to relate to Black and Hispanic community organizations, and 3) that Maurey had made a female staff member uncomfortable.[10] *Id.*

Shawaker also responded to Maurey's internal USC complaint in a letter dated March 7, 1997. Pl. Opp., Bellows Dec., Exh. 20. With regard to Blakely's comment concerning Maurey's race, Shawaker

---

10. A formal complaint was sent to Blakely March 28, 1997 by Alison Covert. Pl. Opp., Bellows Dec., Exh. 33. At a meeting for USC employees involved in the Capacity Building Training Program, Covert had introduced

herself to Maurey as a facilitator of the Capacity Building Program. Bill Davis another USC employee walked into their conversation at which time Maurey said, "I know how you got the job, you had to sleep with Bill." *Id.*

noted, "I expressed the view to George [Evans] that Dean Blakely was making a dispassionate observation about the community, which still harbors some racial bias, rather than expressing a racist bias in himself." *Id.*

In late January 1997, Maurey applied for a project manager position at USC's Regional Technology Transfer Center ("RTTC"). Def. Mot., Dozier Dec., ¶ 3. Kenneth Dozier, the Executive Director of the Engineering Technology Transfer Center, along with Carolyn Suckow, Associate Director of the Western Research Application Center, were the decision makers for this job selection, and they ultimately hired Donald Fullenwider for the position. *Id.*, ¶ 4; Suckow Dec., ¶ 4. Fullenwider had strong credentials that suited their needs. Dozier Dec., ¶ 4. He had an undergraduate degree in Architecture from the University of Houston, and both an M.A. in Architecture and an MBA from UCLA. Pl. Opp., Bellows Dec., Exh. 42. Fullenwider's background in architecture made him compatible with the RTTC's incubator/research park charter. Dozier Dec., ¶ 4. Dozier also found that Fullenwider's computer expertise would aid the RTTC's effort to focus on information technology. *Id.*

A second RTTC Project Manager position became available in July 1997, for which Maurey also applied. Dozier Dec., ¶ 5. Dozier hired Charles Wilcox for this position. Wilcox had 39 years of experience at Hughes Aircraft, including a period managing internal research and development, had been a professor of engineering at USC and UCLA, and was a pioneer in the field of technology transfer. *Id.* Wilcox had an undergraduate degree from Duke University, a

Master's from the University of Illinois, and a Ph.D. from USC. Def. Mot., Wilcox Dec., p. 39. Charles Wilcox, like Maurey, was deaf in one ear. *Id.*

Dozier did not hire Maurey for either of these two positions because a number of people from the RTTC, including Carolyn Suckow, approached him regarding Maurey's work history at USC. Dozier Dec., ¶ 3. The reasons given for not recommending Maurey were his poor work ethic, the fact that he had lost an EDA grant due to poor performance, and his unprofessional behavior. *Id.* In particular, Carolyn Suckow recommended not hiring Maurey because he frequently fell asleep at his desk, made comments containing sexual innuendo, appeared drunk at a reception attended by key economic development players, and on one occasion hugged and kissed Ms. Suckow at work.[11] Suckow Dec., ¶ 2–3. On March 20, 1997 and October 6, 1997, Maurey was advised that he had been denied the first and second RTTC Project Manager positions, respectively. Def. UF, ¶ E2–¶ E3.

In February 1997, Maurey filed a discrimination complaint with the EEOC. Def. Mot., Sbarbaro Dec., Exh. 13. In his first EEOC complaint, Maurey alleged that he had been laid off because he was white, and in retaliation for opposing racial discrimination. *Id.* On April 22, 1997, and November 13, 1997, Maurey filed his second and third EEOC complaints, alleging he was not hired for the two RTTC Project Manager positions to which he had applied, in retaliation for his prior EEOC complaints. *Id.*, Exhs. 14, 15.[12]

At his deposition, Maurey testified that in 1994, he heard Blakely make a refer-

---

11. Not long after Carolyn Suckow began working as Associate Director of the Western Research Application Center ("WESRAC"), Maurey hugged and kissed Ms. Suckow while at work. Maurey Deposition, p. 261. The next day Ms. Suckow confronted Maurey and told him she was very displeased that he had acted so unprofessionally. *Id.*

12. Although Maurey's initial USC internal complaint alleged that he was discriminated against on the basis of race, age, and disability, *viz.*, his hearing impairment, he failed to raise the age or disability claims in any of his three EEOC complaints. Nor did he allege racial "harassment" either in his internal USC complaint, or in any of his three EEOC complaints. Def. Mot., Sbarbaro Dec., Exhs. 12,13, 14, 15.

ence to "my people." Maurey Deposition, p. 289–290. Maurey also testified that in 1995, he heard his co-worker, Len Mitchell, make a statement to the effect, "Gee, it's kind of nice to have a white chauffeur," to which Maurey testified he responded, "Am I missing something here?" *Id.*, p. 163–164. Maurey also testified that in response, Blakely stated: "You must have been asleep during the revolution." *Id.*

On December 15, 1997, Maurey filed this action alleging reverse race discrimination, harassment, retaliation, and breach of contract. Def. Mot., p. 9. In addition, he filed an amended complaint October 30, 1998 adding a claim of disability discrimination. *Id.*

## VI

### DISCUSSION

#### A

*Applicable Standards*
*Summary judgment standard*

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 1). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In a trilogy of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex, supra; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of

material fact. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The governing substantive law dictates whether a fact is material; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden with affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When assessing whether the non-moving party has raised a genuine issue, the court must believe the evidence and draw all justifiable inferences in the non-movant's favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. at 2512. As the Supreme Court explained in *Matsushita,*

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Id.,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted).

To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed.R.Civ.P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

### B

### *Application*

Defendants contend: 1) plaintiff's reverse race discrimination claims fail because plaintiff has not established a prima facie case and cannot establish pretext; 2) plaintiff's retaliation claims fail for the same two reasons; 3) plaintiff's race harassment claim fails because it is time-barred, and the purported conduct does not meet the threshold required to state a claim for hostile-environment race harassment; 4) plaintiff's contract claim fails because the employment relationship was terminable at will; and 5) plaintiff's disability claim is time-barred, and plaintiff fails to establish a prima facie case of discrimination.

### 1. *Reverse Race Discrimination*

Plaintiff concedes that he cannot sustain a claim under 42 U.S.C. § 2000d but argues that he has established a prima facie case of race discrimination. Pl. Opp., p. 15. Plaintiff contends that "[a] colored supervisor [Blakely] elected not to continue his employment, made several racist remarks, and explained that plaintiff's race was a 'strike against him.'" Pl. Opp., p. 17. In addition, plaintiff argues that he was qualified to be the director of the new

center established in the School of Urban and Regional Planning.[13] *Id.* Plaintiff further alleges that EDA funding did not lapse, because there still is a USC Center for Economic Development, and the creation of a new center would require approval by the Assistant Secretary of the Department of Commerce. *Id.* Finally, plaintiff contends that Smith, the EDA Regional Director, was not the actual decision maker concerning Maurey's employment.[14] *Id.,* p. 17–18. Plaintiff also notes that Smith, like Blakely, is African–American, and therefore, necessarily sympathetic towards Blakely. *Id.,* p. 18.

Defendants argue that 1) Maurey cannot establish a prima facie case of discrimination because the grant sponsor, the EDA, concluded his performance was not satisfactory; and 2) Maurey has no evidence of pretext because he cannot dispute that: a) his salary was paid from the EDA grant; b) because of the program's poor performance, the EDA did not renew the grant, resulting in Maurey's layoff; and c) the EDA Regional Director wanted a new team, funded by a new grant, located at a new school, to be assembled under Blakely's leadership. Reply, p. 2 –3.

In order to make out a disparate treatment claim, a plaintiff must prove that he or she was intentionally treated less favorably because of race, color, religion, sex or national origin. *See U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In a Title VII race discrimination action, the court should employ the three-step burden-shifting analysis established by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Although the court employs this

---

**13.** In support of this assertion, plaintiff offers his job evaluations from 1989, 1990, and 1992—96. All but one are completed by George Evans and are favorable. Pl. Opp., Bellows Dec., Exhs. 1–8.

**14.** Plaintiff offers no evidence to support his assertions that a new center would require

approval from the Assistant Secretary of Commerce or that Smith did not have final approval over hiring the director at an EDA-funded center. Plaintiff cites nothing for his first assertion, and cites Exhibit 48 for his second. However, this document does not discuss the regional director's staffing authority.

burden-shifting analysis, the burden of persuasion always remains with the plaintiff. *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir.1988). Therefore, to make out a claim of racial discrimination under Title VII, plaintiff must first prove a prima facie case of race discrimination. Once the plaintiff meets this burden, the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its actions. *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir.1993). Plaintiff must then produce evidence which raises a genuine factual issue as to whether defendant's reasons are merely a pretext for racial discrimination. *Id.* If plaintiff's evidence is lacking, summary judgment is proper for defendant. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890–91 (9th Cir. 1994).

■ To show pretext, and survive summary judgment, plaintiff must produce enough evidence to allow a reasonable factfinder to conclude either that the employer's non-discriminatory reason for the discharge is false, or that the true reason for the discharge was discriminatory. *See Nidds v. Schindler Elevator Corp.* 113 F.3d 912, 918 (9th Cir.1996); *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir.1995) (plaintiff must produce evidence of facts showing discriminatory motive or demonstrate that the employer's non-discriminatory explanation is not credible).

■ To establish a prima facie case of disparate treatment, the plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Proof of discriminatory intent may be direct, circumstantial or inferred from statistical evidence, and all evidence that the plaintiff presents can contribute to the inference in a cumulative manner. *See Stender v. Lucky Stores*, 803 F.Supp. 259, 319 (N.D.Cal.1992). Direct evidence of discriminatory intent is, by itself, sufficient to establish a prima facie case of impermissible discrimination. *See Palmer v. United States*, 794 F.2d 534, 537 n.1 (9th Cir.1986).

■ To make out a prima facie case of intentional discrimination based on indirect or circumstantial evidence, the plaintiff bears the initial burden of showing that (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he was denied the position despite his qualifications; and (4) the position continued to exist, or a similarly situated employee was hired or promoted into the position. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

■ Here, plaintiff fails to establish the second and third prongs of a prima facie case of race discrimination, *i.e.*, that he was qualified to be director of the new center and that he was denied the position despite his qualifications. The Peer Review Report conducted in early 1996 by three directors of similar EDA-funded University Centers was highly critical of Maurey's four-year tenure as director of the old Center. Def. Mot., Sbarbaro Dec. Exh. 32. Although the report did not name plaintiff personally, it did identify program weaknesses generally attributable to a director, such as the absence of a strategic plan, the absence of a long-term vision, the absence of a funding plan, and the absence of a diversified advisory committee.[15] In addition, the peer report identified the Center as a "one-man program" and concluded that the Center had "fallen short of EDA program requirements." This poor evaluation of the Center under Maurey's direction was the basis for the Regional Director's decision not to renew funding for the Center. Regional Director Smith had final approval over University Center staff hiring and would not have approved the reappointment of John Maurey as Director of the EDA-funded University Center because of the

---

**15.** When Blakely suggested Maurey go to Watts to establish an advisory board, plaintiff responded, "I don't go down to that jungle." Def. Mot. p. 6, fn. 5.

performance of the program under his directorship, as reflected in the Peer Review Report. It is irrelevant whether the new center is a continuation of the old center. The facts are undisputed that Maurey was laid off because the EDA determined that under his directorship, the center failed to meet program requirements.

■ Even if Maurey were able to establish a prima facie case of race discrimination, defendants have presented evidence of a legitimate, nondiscriminatory reason for not hiring him for a new position after funding for his old position lapsed—namely, his poor performance. Maurey offers no evidence that this reason is pretextual or that the true reason he was not re-hired in another capacity is anti-white animus. Maurey offers merely his own allegations and theories regarding Blakely's motives, based on a conversation between Dean Blakely and Mr. Shawaker that occurred after Maurey had been terminated.[16] However, these assertions of discriminatory motive and intent are inadequate, given the evidence of a legitimate, non-discriminatory reason for not re-hiring Maurey. The Peer Review Report was conducted by competent professionals who were affiliated neither with Blakely nor with USC. Maurey produces no evidence showing the defendants "cooked up" the report in order to fire him. In fact, Maurey does not attack the credibility of the Peer Report at all, and presents no evidence from which a reasonable factfinder could conclude that the true reason Maurey was not re-hired was anti-white animus. This court finds that Maurey has failed to establish a prima facia case of race discrimination and therefore, *grants* defendants' motion for summary adjudication on plaintiff's first and second claims for race discrimination in violation of Title VII and the FEHA.

## 2. Retaliation

Plaintiff asserts that he has established a prima facie case of retaliation in connection with two RTTC positions for which he was not hired. Pl. Opp., p. 20.[17] He refers to two facts which allegedly establish a causal connection between Blakely and the decision makers, Suckow and Dozier, who declined to hire him for two RTTC positions: 1) USC's Affirmative Action office sent copies of the EEOC complaint to Blakely, Evans, and Shawaker, and 2) "it is customary for USC managers to share information about grievants, and to avoid hiring them." Pl. Opp., p. 21. In addition, plaintiff argues that he has demonstrated a triable issue as to the falsity of defendants' explanation for not hiring him: 1) "USC's written policy mandated that plaintiff be hired for the job if he was *merely* qualified, not best qualified;" 2) Suckow's reasoning is not credible because even though she "claims she was still upset over a hug and a peck on the cheek years earlier ... she subsequently invited plaintiff to her wedding;" 3) defendants' allegations that Maurey was unsuccessful as the Center director are refuted by his performance evaluations; 4) there are no written complaints in plaintiff's file concerning inappropriate behavior towards women; 5) Maurey was not inappropriately drunk, but may have appeared so due to his disability; 6) although plaintiff has fallen asleep on the job, he has a diagnosed sleep disorder; and 7) "USC itself deemed plaintiff qualified for the positions at issue, because the Employment Office screens all applicants." *Id.*, pp. 22–23.

---

16. Plaintiff states that "Blakely has a long history of behavior suggesting racial bias." Pl. Opp., p. 9. As evidence that "Blakely's viewpoint is not completely colorblind," plaintiff cites his past membership in the Southern Christian Leadership Conference, and the fact the Blakely has been recognized by the NAACP and the Association of Black Builders and Contractors. *Id.*

17. Maurey has apparently conceded his retaliation claim for other jobs he sought but was not hired for, as his opposition discusses only the two RTTC positions. In any event, there is no evidence to support such a claim.

Plaintiff has failed to establish a prima facie case of retaliation, because he presents no evidence linking his complaints to his failure to find a job at USC. Moreover, plaintiff fails to raise a triable issue as to whether Suckow's and Dozier's stated reasons for not hiring him were pretexual.

 Title VII prohibits retaliation against an employee for opposing any practice made unlawful by Title VII. 42 U.S.C. § 2000e–3(a). The order and allocation of proof is similar to that of disparate treatment analysis. To prove a prima facie case of unlawful retaliation, a plaintiff must establish that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between the two events. *Trent v. Valley Electric Assn.*, 41 F.3d 524, 525 (9th Cir.1994). If he meets this burden and establishes a prima facie case, the burden of production shifts to defendants to articulate a legitimate, non-discriminatory reason for the termination. *Miller v. Fairchild Industries*, 797 F.2d 727, 730 (9th Cir.1986). If defendants are successful, plaintiff has the ultimate burden to rebut by showing that the proffered explanation is a mere pretext, and that unlawful retaliation is the real reason behind the termination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff must produce "specific, substantial evidence of pretext." *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983).

 Absent direct evidence of retaliation,—the third element of a retaliation claim—a causal link may be established by showing that the adverse employment decision occurred proximate in time to the protected activity, and that the person who made the adverse employment decision knew of the protected activity. *Miller v. Fairchild Industries, Inc.*, 797 F.2d at 731–32 (9th Cir.1986) (evidence that managers who participated in EEOC negotiations were responsible for layoff and layoff

occurred less than two months after negotiation sufficient to establish prima facie case); *see also Payne v. Norwest Corp.*, 113 F.3d 1079, 1079 (9th Cir.1997) (timing of termination creates an inference of causation, where plaintiff filed complaint with human rights commission January 31 and was fired February 9; triable issue of fact concerning whether employer's stated reason for discharge was pretextual precluded summary judgment).

In *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1265 (9th Cir.1997) (Fletcher, J.), the Ninth Circuit affirmed the lower court's grant of summary judgment in favor of the employer with respect to an employee's retaliation claim. Although the Court held that the employer had discriminated against Tarin for her military service, it affirmed summary judgment on Tarin's claim of racial discrimination and retaliation. *Id.* at 1264–65. The Court held that Tarin failed to show a causal link between the protected activity, filing administrative complaints, and the adverse employment action. *Id.* at 1265. Tarin alleged that her employer, the County, retaliated against her by denying her an opportunity to re-interview for a promotion and denying her promotional opportunities. The Ninth Circuit found that Tarin presented no evidence that defendants deliberately tried to avoid re-interviewing her because of her protected activities, and that Tarin presented no evidence linking the County's decision not to promote Tarin to her filing an administrative complaint.

 Here, as in *Tarin*, Maurey fails to establish a causal link between filing the internal USC and EEOC complaints and his failure to receive offers for the two RTTC positions. Maurey adduces no evidence that either Dozier or Suckow ever received copies of the complaints or that they even *knew* of the complaints.[18] Plaintiff shows no connection between Blakely at the School of Urban and Regional Plan-

---

18. As noted above, pp. 7–9, Maurey filed the following complaints: 1) an internal USC written complaint on November 14, 1996; 2)

an EEOC complaint on February 10, 1997; 3) an EEOC complaint on April 22, 1997, and 4) an EEOC complaint on November 13, 1997.

ning and the decision makers for the RTTC position, Dozier and Suckow. Accordingly, he fails to show a connection between his complaints about Blakely and his failure to be hired for either RTTC position. Even if Shawaker, Evans, and Blakely received Maurey's EEOC complaints, this fact fails to establish a connection between Suckow and Dozier on the one hand, and Blakely on the other. Finally, Maurey offers no evidence to suggest that Suckow and Dozier would retaliate against Maurey on Blakely's behalf. Maurey's conclusory allegation that it is customary for USC managers to share information about grievants and not hire them is wholly unsupported. In short, because Maurey cannot establish the third prong of a prima facie claim for retaliation, *i.e.*, a causal link, his claim fails.

Moreover, Maurey fails to allege any facts that would raise a triable issue as to pretext. Maurey cannot dispute that the decision makers were told Maurey had lost the grant funding his salary due to the poor performance of the Center under his directorship, and that he was someone with whom people did not want to work. Maurey Deposition, pp. 88–89, 229, 614–616, and 617–620. Although Maurey's opposition contests Dozier's and Suckow's perceptions of his qualifications, these arguments are irrelevant so long as the assessments made by Dozier and Suckow were made in good faith.[19] In addition, Maurey's performance evaluations, prepared by George Evans, are irrelevant. Evans was not a decision maker for either of the RTTC positions, nor did Dozier or Suckow rely on Evans' advice to select from the pool of applicants. Maurey presents no evidence from which a reasonable

trier of fact could conclude Dozier and Suckow were not acting in good faith when they decided not to hire Maurey.

In addition, Maurey offers no evidence establishing that Dozier and Suckow did not have a good faith belief that Fullenwider and Wilcox were the best qualified candidates for the two RTTC jobs. Both candidates had multiple graduate degrees and work experience directly related to the RTTC Project Manager job functions as identified in Dozier's deposition. Maurey's assertion that he could also be an RTTC project manager does not negate the fact that the candidates hired for the jobs were very well qualified and were believed, by Dozier and Suckow, to be better qualified than Maurey. Finally, whether Maurey was qualified is irrelevant. USC policies do not guarantee that Maurey will be hired for any job for which he may be qualified. USC is entitled to make its own determination as to who is most qualified, so long as it does not do so for unlawful reasons. This court finds that Maurey has failed to establish a prima facie claim of retaliation and therefore *grants* defendants' motion for summary adjudication on plaintiff's third, fourth, and ninth claims for retaliation and tortious termination/refusal to hire in violation of Title VII and the FEHA.

### 3. *Racial Harassment*

Plaintiff contends that Blakely made numerous racially biased remarks to him while Maurey served in his interim position, less than 300 days before he filed his first EEOC claim February 10, 1997. Pl. Opp., p. 23. To the extent these alleged remarks were not disclosed in discovery, they will not be considered by the court.[20]

---

**19.** Plaintiff himself testified he believed Suckow was still mad at him for engaging in inappropriate behavior with her. Such behavior is not a protected activity. *See* Def. Mot., p. 17.

**20.** On April 20, 1999, this court denied plaintiff's request to conduct additional discovery, finding "[p]laintiff's dilatory conduct is not a reason to reopen discovery." April 20, 1999 Order, p. 2.

On April 30, 1999, this court issued an order advising plaintiff that he could not introduce new documents or statements to oppose defendants' motion for summary judgment. "Nothing other than documents already produced by the parties and deposition answers provided by witnesses in this case may be used by plaintiff to oppose defendants' motion for summary judgment." April 30, 1999 Order, p. 16. In violation of the court's order, plaintiff's opposition pa-

Plaintiff's cognizable claim for harassment is based on two comments, one made in 1994 when Blakely made a reference to "my people," and the second made in 1995 in which Len Mitchell, a co-worker, remarked, "Gee, it's kind of nice to have a white chauffeur," to which Maurey testified he responded, "Am I missing something, here?" Maurey also testified that Blakely responded: "You must have been asleep during the revolution." Def. UF, C ¶¶ 1–3. Plaintiff argues that these comments were severe and pervasive enough to cause a reasonable person to feel he was in a hostile environment. Pl. Opp., p. 25.

▮▮▮▮▮▮ Defendants respond, first, by arguing that Maurey's claim for harassment is time-barred.[21] Second, defendants argue that the two comments overheard by Maurey several years ago do not come close to being severe or pervasive. These remarks neither "permeated" the workplace nor created an objectively hostile work environment. Accordingly, defendants contend, Maurey's harassment claim fails as a matter of law.

▮▮▮▮▮▮ Racial harassment in violation of Title VII requires that plaintiff establish the existence of a hostile work environment that is "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (*citing Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The alleged harassment must be sufficiently pervasive, and "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.; see also Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2nd Cir.1986) (a "few, isolated incidents of racial enmity" and "casual comments, or accidental or sporadic conversation" do not "trigger equitable relief" under Title VII). Courts have also applied the *McDonnell Douglas Corp.* framework to hostile environment harassment claims with respect to the shifting burdens between the parties. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Plaintiff's claim of harassment is time-barred. Maurey filed his first EEOC complaint on February 10, 1997.[22] To pursue a claim for harassment under FEHA or Title VII, plaintiff must, within one year or

---

pers sought to rely on statements never produced in discovery. In addition, minutes before the hearing on the summary judgment motion, plaintiff's counsel attempted to submit a faxed declaration from an individual who had advised counsel that the declaration had been faxed by his secretary without his authorization. Finally, after plaintiff himself had twice declared, under oath, that certain tape recordings did not exist, his counsel attempted to introduce parts of the tapes into evidence, following their eleventh-hour appearance. Plaintiff's counsel's conduct falls well below the standards expected of attorneys practicing in the Central District of California.

**21.** The temporal scope of Title VII is governed by 42 U.S.C. § 2000e–5(e). To pursue relief under the FEHA or Title VII, a plaintiff must, within one year or 300 days of the alleged unlawful act, file an administrative complaint with an agency. Cal. Govt.Code § 12960; 42 U.S.C. § 2000e–5(e), *see also United Air Lines v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In

*Evans,* the Supreme Court held that a discriminatory act, not merely the effects of a past discriminatory act, must occur within the limitations period. *Id.*

An employee can establish discrimination under the doctrine of continuing violations by showing a systematic policy and practice of discrimination, which occurs at least partially within the applicable limitations period. *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1480 (9th Cir.1989). Maurey, however, does not allege a systematic policy and practice of discrimination. Therefore, he must demonstrate a series of discriminatory events, one or more of which must fall within the 1–year (Title VII) or 300–day period (FEHA) preceding his first EEOC complaint.

**22.** Plaintiff did nor allege racial "harassment" in any of his three EEOC complaints filed February 10, 1997, April 22, 1997, and November 13, 1997. He did, however, claim racial discrimination in his first (February 1997) complaint.

**1036**

300 days of the alleged unlawful act, have filed an administrative complaint with an agency. Therefore, any comments forming the basis of Maurey's harassment claim must have occurred within the year preceding the February 10, 1997 filing of his first complaint, *i.e.,* no earlier than February 10, 1996. Both of Blakely's comments were allegedly made before 1996, specifically, in 1994 and 1995.

Plaintiff's attempt to save his claim by belatedly introducing · inadmissible evidence not produced in discovery is unavailing.[23] The only statements properly before this court were allegedly made in 1994 and 1995. Plaintiff's claim is thus time-barred.

██ Even were the court to consider the merits of plaintiff's claim, his claim for harassment fails. The two comments, made in different years, were isolated and not pervasive. In addition, the comments were not so severe as to cause a reasonable juror to find that Maurey was subjected to a hostile environment.[24] Therefore, this court *grants* defendants' motion for summary adjudication of plaintiff's first and second claims for harassment in violation of Title VII and the FEHA.

### 4. *Breach of Contract*

██ Plaintiff makes two separate contract claims: 1) breach of the implied contract not to terminate except for "good cause"; and 2) breach of certain representations and safeguards USC promised separate and apart from any "good cause"

requirement. Pl. Opp., p. 25. Plaintiff contends that when he joined USC in 1988, he attended a new employee orientation session and "[a] speaker welcomed the new hires to the 'Trojan family,' and reiterated that USC would always work hard to retain them and help them grow in their careers." *Id.*. Plaintiff alleges that he was not hired on an "at-will" basis, but instead was promised "exactly the opposite: long-term employment, career growth, and affirmative protection in the event of layoff." *Id.*

██ California law establishes a presumption that employment relationships may be terminated at will by either party upon notice to the other. Cal. Lab. Code § 2922. This presumption may be modified by evidence of an express written or oral employment contract, or by evidence of an implied-in-fact employment contract. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 665, 254 Cal.Rptr. 211, 765 P.2d 373 (1988). The existence of an implied-in-fact contract is normally a question for the trier of fact. *Foley,* 47 Cal.3d at 681–82, 254 Cal.Rptr. 211, 765 P.2d 373. However, where the undisputed facts admit of only one conclusion, summary judgment is appropriate. *Davis v. Consol. Freightways,* 29 Cal.App.4th 354, 366, 34 Cal.Rptr.2d 438 (1994).

Several times in the course of his employment at USC, plaintiff signed employment applications containing at-will clauses expressly stating that his employment with USC could be terminated without cause,

**23.** Plaintiff twice swore under oath that certain tape recordings he had made of conversations with Blakely no longer existed. When asked a third time, plaintiff acknowledged the existence of the tapes, but objected to producing them on the grounds that they were "not relevant" and "not reasonably calculated to lead to the discovery of admissible evidence." Def. Mot., Sbarbaro Supp. Dec., Exhs. N, O, P. In his opposition, plaintiff attempted to rely on evidence allegedly contained on the tapes but never provided to the court. Even if the tapes contained the statements plaintiff claims, the court would not reward plaintiff's sandbagging by allowing their admission. Moreover, assuming the tapes contain the statements plaintiff claims, the remarks are,

at most, stray comments, unrelated to any employment decision concerning plaintiff. ·*See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *DeHorney v. Bank of America,* 879 F.2d 459, 468 (9th Cir.1989).

**24.** A reference to "my people" is not necessarily offensive, and Maurey fails to establish that the remark even referred to race. In addition, the exchange concerning the "white chauffeur" is not necessarily hostile and certainly not presumptively so. Taken in the *worst possible light, they fail to justify an* inference of pervasive harassment or a hostile work environment.

that only the President of the University could alter the at-will nature of his employment, and that any such alteration must be in writing. In 1992, before accepting a new job as director of the Center, plaintiff again signed and dated an application which states in section 4: "I ... agree that my employment and compensation can be terminated at-will, with or without cause, at any time, either at my option or at the option of USC." Def. Mot., Sbarbaro Dec., Exh. 38, p. 3. Finally, plaintiff testified that the President of the University never sent him a letter altering his at-will employment status.

Plaintiff offers no evidence of any other employment contract or of an implied-in-fact contract. Although plaintiff now alleges that he did not believe he was bound by the at-will contracts he signed, he testified at his deposition that he understood, read, and signed the contracts, and therefore, cannot now contradict his prior deposition testimony. Def. Mot., Maurey Depo., p. 777; Def. Mot., Sbarbaro Dec., Exhs. 37, 38, 82; *see also Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir.1991)(*citing, Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975)) (party may not raise genuine issue of fact by "sham" declaration contradicting his prior deposition testimony).[25]

Plaintiff's breach of contract claim fails as a matter of law. Plaintiff was an at-will employee and could be terminated or could have quit his job, with or without cause, at any time. Plaintiff adduces no evidence that his at-will status was ever converted into a terminable-for-cause-only employment contract.[26] This court *grants* defendants' motion for summary adjudication on plaintiff's sixth claim for breach of contract.

### 5. Disability Discrimination in Violation of Public Policy

Plaintiff claims that both Dozier and Suckow knew of his hearing disability and used essential function forms, requiring directional hearing, to exclude him from the two RTTC jobs he had applied for in 1997. Pl. Opp., p. 27. Plaintiff argues that directional hearing is not required for the two RTTC positions, and that an unnecessarily high hearing requirement was selected by Suckow because she wanted to retaliate against him. *Id.* Plaintiff also argues that as a matter of law, he is not required to allege a causal link between his disability and the adverse employment action and cites *Hashimoto v. Dalton*, 118 F.3d 671 (9th Cir.1997) for this proposition.[27] *Id.* p. 29.

Defendants counter that Maurey's claim is time-barred because the one-year stat-

25. Plaintiff's declaration is replete with inadmissible evidence, much of which directly contradicts his deposition testimony. As outlined in Defendants' Evidentiary Objections, plaintiff's declaration contradicts his sworn deposition testimony with respect to (1) his understanding of his USC employment contract; (2) the termination of funding for the Center plaintiff directed; and (3) the date when he first saw the form containing the hearing requirements for the RTTC project manager positions. Moreover, plaintiff testified to only one allegedly discriminatory remark made by Blakely to him and confirmed under oath that there were no others. *Id.* To the extent allegations contained in plaintiff's declaration contradict his prior deposition testimony, the court disregards them. *See* April 30, 1999 Order; *Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir.1990)("the process of evaluating a summary judgment motion would be flouted if requests for more time, discovery, or the introduction of supple-

mental affidavits had to be considered even if requested well after the deadline set for the introduction of all information needed to make a ruling has passed."); *cf. Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir.1991).

26. Moreover, for the reasons set forth above, USC had ample cause to terminate plaintiff's employment.

27. In *Hashimoto v. Dalton*, 118 F.3d 671, 674 (9th Cir.1997), the Ninth Circuit held that the dissemination of adverse employment references can constitute a violation of Title VII if motivated by discriminatory intent. There, both the EEOC and the district court found that Hashimoto's supervisor, Lowery, gave her a negative reference in retaliation for her filing an EEOC complaint for race and gender discrimination. The Court noted that the dissemination of the adverse job reference violated Title VII because it was a "personnel ac-

ute of limitations on this claim began to run when he suspected or should have suspected that his injury was caused by wrongdoing. Def. Mot., p. 23. Maurey filed an internal USC complaint alleging disability discrimination in November 1996, and testified he "suspected" he was the victim of disability discrimination in July 1996. Def. UF, ¶ E1. However, Maurey did not amend his complaint to add a public policy disability discrimination claim until October 30, 1998. *Id.*, ¶ E5.

In addition, defendants contend that Suckow and Dozier were not even aware of Maurey's disability, because an affirmative action form completed by both Suckow and Dozier for the first RTTC position, which lists disability status, among others, shows Maurey as not having a disability. *Id.*, ¶ E7. Defendants also argue that the selection of a higher hearing requirement was not an intentional act directed against Maurey; rather, the essential function forms for both RTTC Project Manager positions were copied from a template that also included the same mid-level hearing requirement, generated long before Maurey ever complained of racial discrimination. *Id.*, ¶ E8. In addition, every as essential functions form for every Project Manager position in the WESRAC Department of the School of Engineering, from March 1994, through August 1998, including both RTTC Project Manager positions at issue, have the same mid-level hearing requirement checked. *Id.*, E9. Finally, defendants argue that Maurey cannot show that he was denied the jobs in question due to his disability, because Charles Wilcox, the candidate hired for one of the RTTC positions, is also deaf one ear.

▮▮▮▮▮▮ In order to prevail on a cause of action for wrongful termination in violation of Government Code section 12940, plaintiff must prove: 1) he is a disabled person, as defined in the FEHA; 2) he is qualified to perform the duties of the position with or without reasonable accommodation; and 3) he suffered an adverse employment action because of his disability. *Pensinger v. Bowsmith, Inc.*, 60 Cal. App.4th 709, 719, 70 Cal.Rptr.2d 531 (1998). In applying the FEHA, federal and state courts have employed the shifting burden of proof applied to Title VII discrimination claims as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In addition, the one-year statute of limitations set forth in § 340(3) of the California Code of Civil Procedure governs claims for wrongful termination in violation of public policy. *Barton v. New United Motor Mfg., Inc.*, 43 Cal.App.4th 1200, 51 Cal.Rptr.2d 328 (1996) (because the primary nature of the right sued upon in a [public policy] wrongful termination is personal, the one-year statute of limitations specified in § 340(3) applies).

Plaintiff's claim is time barred. Plaintiff did not move to amend his complaint to add a claim for disability discrimination in violation of public policy until October 30, 1998, more than a year after he was advised he had been denied the RTTC Project Manager positions on March 20 and October 6, 1997, and almost 2 years after he filed an internal USC complaint alleging, *inter alia*, disability discrimination in November 1996.[28]

---

tion" motivated by retaliatory animus. *Id.* at 676. Thus, it is was irrelevant that Lowery's dissemination of the negative job reference was not the reason Hashimoto was denied the job she applied for.

Here, Maurey fails to present any evidence of retaliatory or discriminatory intent. He presents no causal link between his February 1997 filing of an EEOC complaint against Blakely, and his interview and job application review by Dozier and Suckow. Nor can he claim that Dozier and Suckow discriminated against the hearing disabled. One of the applicants hired by Dozier and Suckow shared Maurey's disability. Charles Wilcox is also deaf in one ear. Finally, plaintiff does not argue that filling out generic essential function forms is a personnel action.

**28.** Although plaintiff alleges that he did not realize he had a disability claim until September 1998, his allegation again contradicts his deposition testimony. Maurey Deposition, pp. 492–493; *see also* Def. Reply to Pl. Stmt. of Gen. Iss., pp. 30–32.

Moreover, on the merits, and assuming plaintiff was qualified for the two RTTC positions for which he applied, plaintiff fails to establish the third prong of the prima facie case of disability discrimination, *viz.*, a causal link between his disability and the adverse employment action. There is no evidence of discrimination on the part of Suckow or Dozier. Plaintiff admits that on every form used for every project manager position in WESRAC from March 1994 to August 1998, including both RTTC positions at issue, the mid-level hearing requirement was checked. Maurey Deposition, p. 1380–1382.

 Finally, there is no evidence the decision makers who were selecting applicants for these two positions were averse to hiring an applicant with a hearing disability. Whatever the reason for the apparent requirement of mid-level hearing capability, both sides concede it was not observed. One of the two candidates hired, Charles Wilcox, like Maurey, is deaf in one ear. Maurey responds that "this proves that bilateral hearing is not required for the position—proving that the requirement is excessive—and that Defendants are apparently not prejudiced against the deaf, just against Plaintiff . . . ." Plaintiff's Genuine Issues in Opposition to Defendants' Summary Judgment Motion, ¶ E10. Plaintiff's concession that defendants are not prejudiced against the deaf precludes any claim that he could have suffered an adverse employment action because of his disability. This court *grants* defendants' motion for summary adjudication of plaintiff's tenth claim for disability discrimination in violation of public policy.

## IV

### CONCLUSION

For the reasons set forth above, this court:

1. GRANTS defendants' motion for summary adjudication on plaintiff's first claim for discrimination and harassment under Title VII, 42 U.S.C. § 2000e.

2. GRANTS defendants' motion for summary adjudication on plaintiff's second claim for discrimination and harassment under the Fair Employment and Housing Act (FEHA) Gov.Code, § 12940 *et seq.*

3. GRANTS defendants' motion for summary adjudication on plaintiff's third claim for retaliation under Title VII.

4. GRANTS defendants' motion for summary adjudication on plaintiff's fourth claim for retaliation under FEHA.

5. GRANTS defendants' motion for summary adjudication on plaintiff's sixth claim for breach of contract.

6. GRANTS defendants' motion for summary adjudication on plaintiff's ninth claim of tortious termination or refusal to hire in violation of public policy under FEHA.

7. GRANTS defendants' motion for summary adjudication on plaintiff's tenth claim for disability discrimination in violation of public policy.

On January 8, 1999, Judge Morrow granted defendants' motion dismissing plaintiff's seventh and eighth claims for breach of the covenant of good faith and fair dealing and tortious interference with contract. As noted above, in this motion, plaintiff concedes that he cannot maintain his fifth claim for discrimination in violation of 42 U.S.C. § § 1981 and 2000d.

The defendants' motion for summary judgment is *granted* on the grounds that there are no triable issues of material fact as to any of plaintiff's claims. Judgment on plaintiff's First Amended Complaint shall be entered in favor of defendants.

IT IS SO ORDERED.

### JUDGMENT

On May 24, 1999, the Court heard defendants' Motion for Summary Judgment, or Alternatively, Partial Summary Adjudication, Pursuant to Fed.R.Civ.P. 56. Upon full consideration of the moving, opposition, and reply papers, the relevant authorities, the parties' arguments, and the entire file herein, the Court granted defen-

dant's motion. The issues having been duly heard, and a decision having been duly rendered,

It is Ordered and Adjudged that the plaintiff take nothing and that the action be dismissed on the merits.